UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARIA GROESCHEL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BENEVITY INTERNATIONAL INC., a foreign corporation,<br><br>Defendant. | CASE NO. 2:24-cv-01686-JNW<br><br>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## 1.  INTRODUCTION

This matter comes before the Court on Defendant Benevity International Inc.'s ("Benevity") motion for summary judgment. Dkt. No. 41. Having considered the briefing, the record, the relevant law, and the parties' oral arguments, the Court is fully informed. For the reasons below, the Court GRANTS IN PART and DENIES IN PART the motion.

## 2.  BACKGROUND

Benevity is a Canadian corporation that sells software designed to facilitate charitable donations, volunteer participation, and grantmaking. Dkt. No. 45 ¶ 3.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 1

Plaintiff Maria Groeschel sought employment at Benevity, drawn to the opportunity to "contribute to a smaller, mission-driven organization whose values aligned with [her] own." Dkt. No. 28 ¶ 4. In July 2023, Groeschel interviewed for the position of Vice President (VP), Sales Strategy & Enablement. *Id.* ¶ 3*; see also* Dkt. No. 45-4 at 2. Benevity formally offered Groeschel the position around August 23, 2023. Dkt. No. 28 ¶ 5.

On August 25, 2023, Groeschel had a lunch meeting with Lance Ludman, Benevity's Chief Financial Officer. *Id.* Ludman told Groeschel that Benevity's sales department had missed its targets and needed someone to "bring . . . structure, rigor, and improve performance and tracking in the sales organization." *Id.*

Groeschel testified that Ludman told her she would be a "change agent and disruptor" and would be "well-positioned for a future path to the Chief Revenue Officer (CRO) role at Benevity." *Id.* Based on her conversation with Ludman, Groeschel understood the CRO position would become available in approximately six to twelve months. *Id.*

Groeschel accepted Benevity's offer and signed the at-will employment agreement on August 28, 2023. Dkt. No. 45-4 at 4. During the onboarding process, Groeschel signed copies of Benevity's "Respectful Workplace" and "Do the Right Thing" policies. Dkt. Nos. 45 ¶ 3; 45-1 at 1–8. She also read and signed Benevity's "See Something, Say Something" policy. Benevity's written materials provide, among other things, that Benevity has "a responsibility to look into every report of a violation that [it] receive[s]. The approach and extent of action taken will be determined by circumstances and details of the concern reported (e.g., seriousness,

legitimacy, amount of information provided, evidence, etc.,).” Dkt. No. 27-7 at 2. In addition, “[r]etaliation against anyone for making a good faith report of a concern or for participating in a related investigation is prohibited.” Dkt. No. 17-1 at 7.

The parties present different narratives about Groeschel’s effectiveness during her tenure as VP, Sales Strategy & Enablement. Benevity highlights employee testimony that Groeschel was a poor leader and uncollaborative with team members. *See, e.g.*, Dkt. No. 43 ¶ 5 (“[Groeschel] began . . . offering condescending, unsolicited opinions on product management”); Dkt. No. 44 ¶ 5 (“[Groeschel] appeared disengaged from discussions, frequently typing on her computer while other Sales leaders presented”); Dkt. No. 44 ¶ 9 (“[Groeschel] repeatedly used inaccurate numbers in the forecast” during her sales presentation on December 14, 2023); Dkt. No. 45 ¶ 4 (Groeschel “twice shared that she wanted others to ‘get out of [her] way’”); Dkt. No. 46-5 at 7 (“[Groeschel] wasn’t super reactive on Slack”); and Dkt. No. 46-8 (Groeschel spoke “inappropriately” about her team by describing them as “incompetent.”).

On the other hand, Groeschel highlights her own and others’ testimony countering these allegations. Dkt. No. 28 ¶¶ 16–17 (“[Groeschel] made meaningful progress in building strong and collaborative relationships across the organization” and “also received consistent, unsolicited positive feedback from peers.”); Dkt. No. 48-4 at 7 (“[Groeschel was] somebody who could bring a little bit more [needed] structure and discipline across the different parts of the sales team”); Dkt. No. 48-7 at 21–22 (Groeschel presented well at the sales forecast meeting in December); Dkt.

No. 48-7 at 23 (Groeschel never presented inaccurate sales numbers); and Dkt. No. 48-8 at 6 (Groeschel "was very curious" and "involved with her team").

Less than a month into her tenure, on October 9, 2023, Groeschel learned from Benevity's Chief Executive Officer Kelly Schmitt that "Benevity had activated an external search for a CRO." Dkt. No. 28 ¶ 26. Groeschel expressed her interest to Schmitt, who "indicated she was unaware" of Groeschel and Ludman's discussion about growing into the CRO role. *Id.* ¶ 27. On November 1, 2023, Groeschel and other candidates began interviewing for the CRO position. Dkt. No. 47 ¶ 5. Benevity hired a third-party executive search firm—the Cole Group—to conduct the interviews. On November 30, 2023, the Cole Group informed Benevity Chief People Officer Janeen Speer that it had decided not to advance Groeschel for the role. *Id.* ¶ 6.

Also in November 2023, Groeschel's direct supervisor, Trey Yost, left Benevity. Dkt. No. 44 ¶ 4. Julie Werner, then Benevity's Executive Vice President, Client Success, became leader of the sales organization and Groeschel's interim direct supervisor. *Id.*

On December 15, 2023, Groeschel requested formal leave due to a flood emergency at her home. Dkt. No. 28 ¶ 57. Speer approved her request, and Groeschel remained on leave from December 18, 2023, through January 5, 2024. *Id.* The following week, on January 12, 2024, Werner and Groeschel met virtually for Groeschel's formal performance review. *Id.* ¶ 59. Groeschel found Werner's feedback "to be highly subjective, personal in tone, and lacking in specific or fact-based examples." *Id.* That day, Groeschel submitted a complaint to Speer about Werner's

performance review. *Id.* ¶ 68. In her complaint and subsequent conversation with Speer, Groeschel expressed her belief that Werner's "review was not only unfair and misaligned with [her] actual performance, but was also based on subjective impressions and personal bias, rather than objective data or concrete examples." *Id.* ¶ 70. Groeschel stated in a Slack message that Werner's review was "a DEI offense and implicit bias [against her] leadership approach." Dkt. No. 48-4 at 35. Speer did not investigate or speak with anyone mentioned in Groeschel's complaint; instead, Speer concluded the "allegations against Werner were baseless." Dkt. No. 20 ¶ 11.

On January 16, 2024, Speer and Benevity Vice President of People Kate Alexander met with Groeschel and told her Benevity had decided to terminate her employment. Dkt. Nos. 28 ¶ 83; 45 ¶ 6; 47 ¶ 12.

Groeschel filed a complaint against Benevity, alleging eight causes of action: the first and second causes of action for race and national origin discrimination including disparate treatment and wrongful termination in violation of the Washington Law Against Discrimination, RCW 49.60 *et seq.* (WLAD); the third and fourth causes of action for retaliation including disparate treatment and wrongful termination in violation of the WLAD; the fifth, sixth, seventh, and eighth causes of action for breach of implied contract, breach of quasi-contract, breach of contract, and promissory estoppel. Dkt. No. 1 ¶¶ 5.1–7.20.

Benevity moved for summary judgment on June 11, 2025—almost six months before the dispositive motion deadline. Dkt. No. 15. In response, Groeschel moved to compel and continue discovery under Federal Rule of Civil Procedure 56(d). Dkt. No. 21. The Court found Benevity's motion premature and denied it without

prejudice. Dkt. No. 34 at 5. The Court also extended the discovery deadline for Groeschel to depose Werner. Dkt. No. 40 at 1. On February 24, 2026, the Court denied Benevity's motion to reopen discovery and granted Groeschel a protective order against Benevity's late-issued subpoena to Dropbox concerning Groeschel's subsequent employment. Dkt. No. 59 at 5.

### 3.   LEGAL STANDARD

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (citation omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "in the light most favorable to the non-moving party." *Barnes v. Chase Home Fin.*, LLC, 934 F.3d 901, 906 (9th Cir. 2019) (citation omitted).

In an employment discrimination case, the plaintiff "need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)). But even this forgiving standard does not excuse a "complete failure of proof

concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The nonmoving party may not rely on the mere allegations in the pleadings to show a "genuine issue for trial," but must instead "set forth specific facts[.]" *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) (quoting *Liberty Lobby*, 477 U.S. at 256). This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). Thus, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

## 4.  DISCUSSION

### 4.1    Conceded claims are dismissed.

In response to Benevity's motion, Groeschel concedes her first and second causes of action for race and national origin discrimination. Dkt. No. 68 at 19 n.4. At oral argument, Groeschel's counsel also confirmed that her wrongful termination in violation of public policy claim was no longer at issue. Accordingly, the Court GRANTS summary judgment on those claims.

## 4.2    Disputes of material fact preclude summary judgment on Groeschel's retaliation claim.

To establish a prima facie retaliation claim under the WLAD,[1] a plaintiff must show that "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision." *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065–66 (9th Cir. 2003) (citation omitted); *see also Graves v. Dep't of Game*, 887 P.2d 424, 427 (Wash. Ct. App. 1994). Benevity's central argument is directed at the third element, causation, but it also disputes the first, protected activity. The Court takes the elements in turn.

The first element is satisfied, at least for purposes of summary judgment. The WLAD shields from retaliation employees who "oppose[] any practices forbidden by [the WLAD]," including workplace discrimination based on race, sex, or other protected characteristics. RCW 49.60.210(1). The employee need not prove that the conduct she opposed was actually unlawful; "[a] reasonable belief by the employee, rather than an actual unlawful employment practice, is all that need be proved to establish a retaliation claim." *Ellis v. City of Seattle*, 13 P.3d 1065, 1071 (Wash. 2000) (citing *Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994)); *see Elgiadi v. Wash.*

---

[1] Benevity argues that Groeschel abandoned her common law retaliation claim for termination in violation of public policy. The Court, however, does not find that Groeschel ever plead this claim. *See* Dkt. No. 1 ¶ ¶ 6.1–6.13 ([Third and Fourth Causes of Action:] Retaliation Including Disparate Treatment and Wrongful Termination in Violation of Washington Law Against Discrimination, RCW 49.60, *et seq*.). And at oral argument, Groeschel's counsel confirmed that wrongful termination in violation of public policy was not a live claim. Thus, the Court does not address Benevity's argument.

*State Univ. Spokane*, 519 P.3d 939, 944 n.2 (Wash. Ct. App. 2022) ("Unlawful retaliation may be proved regardless of the success of the underlying discrimination claim."). Nor must the opposition take any particular form—an informal complaint may qualify. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506–07 (9th Cir. 2000); *Moyo*, 40 F.3d at 985.

Applying that standard, a reasonable jury could find Groeschel engaged in a protected activity. When she complained to Speer—and stated in a Slack message—that Werner's performance review reflected "a DEI offense and implicit bias [against her] leadership approach," she voiced opposition to what she perceived as discriminatory bias. Dkt. No. 1 ¶ 6.5.[2] Benevity responds that Groeschel's complaint targeted ordinary performance criticism rather than discrimination, and argues that she later retreated from the "DEI offense" characterization in her conversation with Speer. If true, those points may bear on the persuasiveness of her claim at trial, but they do not negate protected activity as a matter of law. Because the opposition clause does not require that the underlying discrimination be proved—or even be provable—Groeschel's later concession of her disparate-treatment claims does not strip her January 12 complaint of its protected character.

The second element requires little discussion—Benevity does not dispute that Groeschel's termination is an adverse employment action. That leaves the third element, causation.

---

[2] In her complaint, Groeschel also alleges that she "engaged in multiple protected activities by formally requesting a leave of absence [on] two occasions." Dkt. No. 1 ¶ 6.4. At summary judgment, however, Groeschel abandons this theory of retaliation. *See* Dkt. No. 68 at 24–26.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 9

Benevity argues Groeschel fails to establish a causal link between her protected activity and her termination because Benevity made the decision to fire Groeschel *before* she complained. Dkt. No. 49 at 5. To support its conclusion, Benevity points to Werner, Alexander, and Speer's declarations, and Slack messages. *Id.* Specifically, Speer and Alexander testified that, on January 10, 2024, Schmitt told them Benevity planned to terminate Groeschel—two days before her January 12 complaint. Dkt. Nos. 45 ¶ 5; 47 ¶ 8. Similarly, Werner testified that, on January 10, 2024, Schmitt, Alexander, and Speer told her that Benevity planned to terminate Groeschel. Dkt. No. 44 ¶ 13. If the decision truly predated the protected activity, the complaint could not have caused the termination, and the claim would fail. But viewed in the light most favorable to Groeschel, the timing of the decision is genuinely disputed.

Benevity's own witnesses could not confirm when the final termination decision was made, Dkt. No. 68 at 12, and the contemporaneous messages cut both ways, *id.* On January 9, 2024, Speer texted Schmitt, "[w]e are talking about [Groeschel] timing etc." Dkt. No. 48-12 at 4. Hours later, Schmitt sent Speer a list of "topics for later," including the timing of an announcement regarding Groeschel. *Id.* Then, on January 10, 2024, Alexander texted Werner that "sounds like we are back on for [Groeschel] departure next week." Dkt. No. 48-6 at 13. Yet the very next day—after the supposedly final decision—Werner and Alexander were still developing feedback for Groeschel's performance review, even collaborating on a document containing her self-assessment. Dkt. No. 48-6 at 16. A reasonable jury could find these messages suggest firing Groeschel had not been decided at this

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 10

point given her supervisor was working on her performance review and the phrase "sounds like we are back on for [Groeschel's] departure next week" indicates a back-and-forth about timing. Therefore, a dispute of fact exists as to the exact timing of when Benevity decided to terminate Groeschel. That dispute alone precludes summary judgment on this claim.

Because Groeschel does not present direct evidence that Benevity fired her because of her protected activity, the *McDonnell Douglas* burden-shifting framework applies. *Cornwell v. Microsoft Corp.*, 430 P.3d 229, 234 (Wash. 2018). A close "proximity in time between the complaint and the termination is sufficient to create a reasonable inference that, *for purposes of showing a prima facie case*, [the plaintiff's] complaint was a significant factor in the decision to terminate [her]." *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 385 (Wash. Ct. App. 2020) (emphasis in original). Groeschel submitted her complaint on January 12, 2024, and Benevity informed her that she was terminated on January 16, 2024. That four-day interval establishes the temporal proximity needed for a prima facie case. *See Passantino,* 212 F.3d at 507 (holding that when adverse employment decisions occur within a reasonable period after complaints, retaliatory intent may be inferred).

The burden then shifts to Benevity to "articulate a legitimate, nondiscriminatory reason for the discharge." *Mackey*, 459 P.3d at 386. Benevity states that it fired Groeschel because its CEO "witnessed" her "acting disengaged at leadership meetings, overstepping into other departments and providing condescending, unsolicited feedback, and producing inaccurate work product[.]" Dkt. No. 47 ¶ 8. Benevity has met its burden of production, so Groeschel must produce

evidence sufficient to establish a genuine dispute as to pretext. *See Mackey*, 459 P.3d at 386. But an employee's bare "assertion of good performance to contradict the employer's assertion of poor performance does not give rise to a reasonable inference of [pretext]." *Id.* at 387 (quoting *Chen v. State*, 937 P.2d 612, 617 (Wash. Ct. App. 1997)). Groeschel offers more than that.

Benevity has described the basis for her termination in differing terms. Speer attests that the CEO concluded Groeschel "was not right for the team." Dkt. No. 47 ¶ 8. The reason communicated to Groeschel at the termination meeting was "her conduct and misalignment with Benevity's core values, including humility and respect." Dkt. No. 45 ¶ 6; *see* Dkt. No. 44 ¶ 13. And Benevity separately marshals a catalog of performance deficiencies, including that Groeschel "produc[ed] inaccurate work product." Dkt. No. 47 ¶ 8; *see* Dkt. No. 44 ¶¶ 5, 9. Drawing inferences in Groeschel's favor, a jury could view these varied explanations as inconsistent—particularly because Werner, the source of the "inaccurate" criticism, retreated from it at deposition, testifying that her concern was not that Groeschel's work "was inaccurate" but that it could have been presented more clearly. Dkt. No. 48-7 at 10, 23. The record also rebuts Benevity's performance narrative from other sources: Yost, Groeschel's first supervisor, wrote that she had a "massive impact within Sales and across the business," Dkt. No. 48-7 at 37, and a colleague testified that she "asked a lot of questions," "was very curious," and was "involved with her team," Dkt. No. 48-8 at 6. Taken together, and especially in combination with the disputed timing of the termination decision, this evidence would permit a reasonable jury to disbelieve Benevity's stated reasons and find pretext.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 12

Benevity's reliance on *Kelly* and *Kama* does not change the analysis. *See* Dkt. No. 49 at 7 (citing *Kelly v. Boeing Co.*, 848 F. App'x 692, 694 (9th Cir. 2021); *Kama v. Mayorkas*, 107 F.4th 1054, 1061 (9th Cir. 2024)). In *Kelly*, the employer stated that it terminated an employee because he attempted to tamper with a required urine test. 848 F. App'x at 694. The Ninth Circuit held that temporal proximity alone was insufficient evidence of pretext in light of the substantial evidence that the employee did tamper with the urine test. *Id.* Here, by contrast, Groeschel does not rely on timing alone, as she refutes Benevity's stated reasons. And *Kama*, where a gap of 56 days between the protected activity and adverse action was too attenuated to support an inference of causation, only underscores the strength of the four-day difference here. 107 F.4th at 1061.

In short, two independent disputes of material fact preclude summary judgment on the retaliation claim—either dispute, standing alone, requires that the claim proceed to trial.

## 4.3    Benevity is entitled to summary judgment on Groeschel's breach-of-contract claims.

To establish a breach-of-contract claim, the plaintiff must show: "(1) a valid contract, (2) a breach of duty arising under that contract, and (3) the resulting damage." *Silvey v. Numerica Credit Union*, 519 P.3d 920, 925–26 (Wash. Ct. App. 2022). "Employment contracts are governed by the same rules as other contracts." *Pierce v. Bill & Melinda Gates Found.*, 475 P.3d 1011, 1016 (Wash. Ct. App. 2020) (quoting *Kloss v. Honeywell, Inc.*, 890 P.2d 480, 483 (Wash. Ct. App. 1995)). And "[a]n enforceable contract requires . . . an offer with *reasonably certain* terms."

*Andrus v. State, Dep't of Transp.*, 117 P.3d 1152, 1154 (Wash. Ct. App. 2005) (emphasis in original) (finding no employment contract where the offer contained no starting date, salary, or benefit information).

### 4.3.1    Groeschel's good-faith claim is distinguishable from *Pierce.*

Groeschel argues she "contracted with Benevity to serve as a change agent and disrupt the practices of the underperforming sales organization," and that Benevity violated its contractual duty of good faith and fair dealing by frustrating her in that role. Dkt. No. 68 at 22. She relies on *Pierce v. Bill & Melinda Gates Found.*, 475 P.3d 1011 (Wash. Ct. App. 2020).

*Pierce* does not carry the weight that Groeschel places on it. There, the Gates Foundation recruited Pierce to be its first ever Chief Digital Officer (CDO)—an at will position—through a written offer and negotiations in which the parties objectively agreed that the role would be "far-reaching and transformational" and not a glorified IT operations manager—indeed, Pierce expressly rejected a role centered on IT work. *Id.* at 1016–19. Notwithstanding their agreement, "Pierce was consistently told to scale back and focus on IT." *Id.* at 1019. The court held that, while the Foundation could modify Pierce's job duties given his status as an at-will employee, it could not "fundamentally change what it meant to be the CDO of the . . . Foundation" by relegating him to the IT role the parties agreed he would *not* occupy; doing so would "render that fundamental promise illusory." *Id.* at 1018. The duty of good faith supplied the limit—it governs performance of "'the obligations imposed by [the parties'] agreement'" and does not compel a party to accept a

material change to those terms. *Id.* (quoting *Badgett v. Sec. State Bank*, 807 P.2d 356 (Wash. 1991)). And because the employment was at-will, the parties had "expressly bargained away" any good-faith limit on "a decision to terminate," though the duty still governed "the other terms and conditions of employment." *Id.* at 1018–19.

Groeschel presents a different set of circumstances. *Pierce* turned on an objective, negotiated manifestation of a specific role—a written offer and defined accountabilities—whereas Groeschel relies on Ludman's remarks at a recruiting lunch that she would be a "change agent" and "disruptor." Dkt. Nos. 48-4 at 17–18; 48-4 at 14, 17. Even crediting that account, Ludman's statements do not reflect any agreement that Benevity surrendered its ordinary prerogative to evaluate and direct Groeschel's performance in her role. Unlike *Pierce,* where the Foundation changed the substance of the role, directing Pierce to "scale back and focus on IT" after agreeing he would not, Benevity did not redefine the VP position in the same way. There is no evidence showing a meeting of the minds as to what the parties meant by "change agent" and "disruptor" in the context of the VP, Sales Strategy & Enablement. In the end, an at-will employer's management of how an employee does her job is not the fundamental alteration of an agreed role that *Pierce* found actionable, and because Groeschel identifies no enforceable term that Benevity breached, her good-faith claim fails as a matter of law.

### 4.3.2    Groeschel fails to establish she was owed specific treatment in a specific situation.

An employer may be bound by written materials that promise "'specific treatment in specific situations'" and thereby induce an employee "'to remain on the job and not actively seek other employment[.]'" *Korslund v. DynCorp Tri-Cities Servs.*, Inc., 125 P.3d 119, 128 (Wash. 2005) (quoting *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1088 (Wash. 1984)). Independent of contract, the claim requires (1) a statement amounting to a promise of specific treatment, (2) justifiable reliance, and (3) breach. *Id.* (citing *Bulman v. Safeway, Inc.*, 27 P.3d 1172 (Wash. 2001)). Each element is ordinarily a fact question, but the issues may be resolved as a matter of law "if reasonable minds could not differ." *Id.* at 128. They could not differ here.

Groeschel argues that Benevity's "See Something, Say Something" policy promised a particular investigative response and that Speer breached it by "unilaterally reject[ing]" her DEI complaint without interviewing other witnesses. But "general statements of company policy" are not promises of specific treatment. *Thompson*, 685 P.2d at 1088. And policies in which employers retain discretion are often not specific enough to create a promise of specific treatment. *See Drobny v. Boeing Co.*, 907 P.2d 299, 303 (Wash. Ct. App. 1995) ("Where an employer retains the discretion to decide what types of offenses will be serious enough to merit immediate dismissal, the employer makes no promise of specific treatment."); *see also Thompson*, 685 P.2d at 1088 ("the employer may specifically reserve a right to

modify those policies or write them in a manner that retains discretion to the employer.").

Here, Benevity expressly retains discretion to determine how to handle employee complaints—"[t]he approach and extent of action taken will be determined by circumstances and details of the concern reported (e.g., seriousness, legitimacy, amount of information provided, evidence, etc.)." Dkt. No. 27-7 at 2.

As a result, Groeschel's reliance on *Wlasiuk v. Whirlpool Corp.* is misplaced. 914 P.2d 102, 110 (Wash. Ct. App. 1996), *modified on other grounds*, 932 P.2d 1266 (Wash. Ct. App. 1997). In *Whirlpool*, the court held that the employer (Whirlpool) violated two applicable provisions in its employee handbook—that human resources would investigate before an employee was terminated for gross misconduct and that two corporate officers would approve the firing of an employee with ten or more years of service. *Id.* at 111–12. Notwithstanding these handbook provisions, Whirlpool fired the plaintiff without human resources conducting an investigation and without the informed approval of two officers. *Id.* at 110–111. The *Whirlpool* provisions left no discretion over whether the promised steps would occur; Benevity's policy, which makes even the threshold inquiry contingent on its own assessment, contains no comparable commitment.

Accordingly, the Court finds that, as a matter of law, Benevity's written materials did not entitle Groeschel to a specific response.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 17

**4.4    Benevity is entitled to summary judgment on Groeschel's standalone promissory estoppel claim.**

Beyond her claim regarding Benevity's written materials, Groeschel alleges that Benevity made promises she justifiably relied on to change her position.

A plaintiff seeking recovery in promissory estoppel must establish: "(1) a promise which (2) the promisor should reasonably expect to cause the promisee to change [her] position and (3) which does cause the promisee to change [her] position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise." *Havens v. C & D Plastics, Inc.*, 876 P.2d 435, 442 (Wash. 1994) (citation modified).

In support of her claim, Groeschel testified to the following:

- "Ludman . . . stated that, given my executive-level experience across marketing, sales, and operations, I would be well-positioned to continue bringing the IP I was known for in my career—change agent and disruptor[.]" Dkt. No. 28 ¶ 5.

- "Ludman explicitly stated that my background was exactly what the company needed and emphasized that if I were to accept the role, it would be a mutually beneficial engagement." *Id.*

- "Ludman indicated this role may become available in approximately 6 to 12 months, providing an opportunity for me to demonstrate impact and growth into the role once performance improvements were made." *Id.*

- Benevity asked her to defer her enrollment in a business program at Wharton to immediately begin onboarding at Benevity. *Id.*

Ludman's statement that Groeschel would be "well-positioned to continue bringing the IP [she] was known for in [her] career—change agent and disruptor" is not specific enough to enforce. As the Court has explained, what it means to be a "change agent" or "disruptor" is not objective. An employee's "own subjective

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 18

expectations about the nature of the employment relationship do not support the existence of a specific, enforceable promise." *Quezada v. City of Entiat*, No. 2:18-CV-118-RMP, 2018 WL 4289327, at *13 (E.D. Wash. Sept. 7, 2018).

Ludman's statement that Groeschel's employment would be mutually beneficial is likewise unenforceable—it is merely aspirational. *See Havens,* 876 P.2d at 444 (statement that the employer was "looking forward to a long and prosperous future" with the plaintiff was consistent with the general expectation present in hiring, i.e., "the employer was hoping for and expecting a long-term, mutually satisfactory relationship.").

As to the CRO role, Groeschel does not provide evidence that Ludman made a "clear and definite promise" that she would become CRO if she accepted the VP position. *Id.* at 443 ("[W]here the terminable at will doctrine is concerned, the promise for promissory estoppel must be 'clear and definite promise.'"). She attests only that Ludman told her that "[she] would be well-positioned for a future path to the [CRO] role at Benevity." Dkt. No. 28 ¶ 5. "Well-positioned" for the CRO is not a clear and definite promise that Groeschel would become CRO.

Groeschel also says she understood that "the CRO position was not currently open or being actively pursued[,]" and that "Ludman indicated this role may become available in approximately 6 to 12 months[.]" *Id.* The record proves this timeline false—Benevity interviewed Groeschel for the CRO position on November 1, 2023, roughly two months after her lunch with Ludman. That timing undercuts any justifiable reliance on the six-to-twelve-month window Groeschel describes.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 19

In any event, Groeschel cannot show that any such representation caused her to change her position to her detriment or that injustice can be avoided only by enforcement. She states that "[h]ad [she] been told that the CRO position was active or already under search, [she] would have declined the VP role and instead sought consideration for the CRO position directly." Dkt. No. 28 ¶ 5. But Groeschel was in fact considered for the CRO role—she interviewed in November and was not selected—so the only concrete opportunity she describes is one she received. She identifies no promise that she would be awarded the position, and the promise of an opportunity to compete was honored. Enforcement is not necessary to avoid injustice.

Finally, as to Groeschel's decision to defer her Wharton enrollment to begin onboarding at Benevity, she fails to articulate an unrealized promise. Groeschel presents no evidence that she did not begin onboarding for the role she was offered at the expected time. Accordingly, the Court enters summary judgment against Groeschel on her promissory estoppel claim.

## 4.5    Groeschel's motion to strike and for an order to show cause.

Groeschel moves for relief in her response to Benevity's motion for summary judgment. First, Groeschel moves to exclude statements in the declarations of Werner, Speer, and Alexander, arguing they are inadmissible hearsay about when Benevity's CEO and incoming CRO decided to terminate her. Dkt. No. 68 at 17. The Court finds this motion premature. At this stage, the Court has determined that a factual dispute exists about when and why Benevity terminated Groeschel, and her

retaliation claim may proceed to trial. Groeschel may object at trial to evidence proffered by Benevity and the Court will consider its admissibility then.

Second, Groeschel asks the Court to order Benevity to show cause why certain records were not produced in discovery and why the Court should not reopen discovery. Dkt. No. 68 at 18–19. Given that discovery has closed, the Court construes this request as a motion to reopen. When ruling on a motion to reopen discovery, the Ninth Circuit directs district courts to consider: (1) "whether trial is imminent," (2) "whether the request is opposed," (3) "whether the non-moving party would be prejudiced," (4) "whether the moving party was diligent in obtaining discovery within the guidelines established by the court," (5) "the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court," and (6) "the likelihood that the discovery will lead to relevant evidence." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066 (9th Cir. 2017) (quotation omitted). After considering these factors, the Court finds that reopening discovery is unwarranted.

Although trial is not imminent, Benevity opposes Groeschel's request and would experience prejudice if the proceedings were further delayed. Moreover, Groeschel was not diligent in seeking the allegedly missing documents. She argues that she confirmed the existence of Slack messages between Groeschel and Tempest and another colleague during their depositions. Dkt. No. 68 at 15–16. But those depositions took place on October 14 and 15, 2025, Dkt. Nos. 68-2 at 2; 48-8 at 2, and Groeschel did not raise the issue with the Court until filing her response on December 29, 2025. Groeschel also cites Werner's deposition as evidence of further

Slack messages concerning feedback she solicited from one of Groeschel's colleagues. Dkt. No. 68 at 16. Although Werner's deposition took place later, on December 8, 2025, Groeschel filed nothing with the Court, reasoning she "should not be required to incur the time and expense to file repeated motions simply to ensure that Benevity complies with its affirmative obligations under the Rules of Civil Procedure." Dkt. No. 68 at 18. While the Court understands Groeschel's perspective, it cannot say she acted diligently under the circumstances, given the foreseeability that she would seek relief regarding these documents.

Finally, it is not likely that reopening discovery would lead to relevant evidence. Groeschel argues that additional Slack messages between her and her coworkers would provide "more information as to what exactly happened during [her] employment." Dkt. No. 68 at 18. This is too general to show probative value. Groeschel also states that the messages may create "more certainty about what [Schmitt] said, what she decided, and when," given that Benevity did not provide "evidence of a Slack written by [Schmitt] confirming the date or reason for [Groeschel's] termination[.]" *Id.* at 13, 18. But Groeschel merely speculates that these documents exist, and Benevity denies failing to supplement its discovery responses. Accordingly, the Court finds that reopening discovery would be inappropriate. Groeschel's motion to strike and for an order to show cause is DENIED.

**4.6    Benevity's motion to strike.**

Benevity asks the Court to strike the following statements from Groeschel's declaration.

- "My contributions were additive and transformational . . . ." Dkt. No. 28 ¶ 38.

- "At no point did I offer this input unsolicited or in a boastful or condescending manner." *Id.* ¶ 12.

- "Any assertion I was disengaged from my role during my tenure at Benevity . . . is factually inaccurate . . . ." *Id.* ¶ 32.

- "Any suggestion or argument that my conduct during this period was inappropriate or based in ego is not accurate . . . ." *Id.* ¶ 15.

Benevity argues that these statements are "uncorroborated self-serving testimony," "unsupported conjecture," and "conclusory." Dkt. No. 49 at 2 (quoting *Saevik v. Swedish Med. Ctr.*, No. C19-1992-JCC, 2021 WL 5918595, at *2 (W.D. Wash. Dec. 15, 2021), *aff'd*, No. 22-35023, 2023 WL 3335901 (9th Cir. May 10, 2023)).

The Court finds no reason to strike these statements at this time. Groeschel's statements are not entirely uncorroborated—she presents testimony from other employees that her work had a major impact on sales, that she was approachable and involved with team members, and that she asked a lot of questions and came across as curious. And while some statements are conclusory when viewed in isolation, they are not when read in context of a declaration that provides supporting examples. *See generally* Dkt. No. 28.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 23

Benevity also asks the Court to strike statements it perceives as legal arguments rather than facts based on Groeschel's personal knowledge. Again, this objection is premature—to the extent Groeschel's statements are legal conclusions the Court does not rely on them for the purposes of summary judgment. When the case goes to trial, Benevity may raise this objection if it believes Groeschel will testify on matters outside the scope of her personal knowledge. Benevity's motion to strike is DENIED.

## 5.  CONCLUSION

In sum, the Court GRANTS IN PART and DENIES IN PART Benevity's motion for summary judgment, Dkt. No. 41, as follows:

1. The Court GRANTS IN PART Benevity's motion for summary judgment and dismisses Groeschel's national and racial discrimination, contract, and promissory estoppel claims.

2. The Court DENIES IN PART Benevity's motion for summary judgment as to Groeschel's retaliation claim.

3. The Court DENIES Groeschel's motion to strike and for an order to show cause.

4. The Court also DENIES Benevity's motion to strike.

Within TWENTY-ONE (21) days of this Order, the parties must file a joint status report that (a) states the number of trial days the case is expected to require, and (b) identifies any dates within the next six months on which trial counsel have

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 24

conflicts or other scheduling complications. The Court will set this matter for trial within six months of this Order and will consider the report in scheduling it.

Dated this 4th day of June, 2026.

Jamal N. Whitehead
United States District Judge

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 25